FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO

2011 FEB -1 AM 11: 55

# IN THE UNITED STATES DISTRICT COURT

GREGORY C. LANGHAM
CLERK

BY _____ DEP. CLK

# FOR THE DISTRICT OF COLORADO

Civil Action No. _____ '11 - CV - 0 0 2 5 7

Betty J. Barkman

Gerald E. Heal

*Plaintiffs*

v.

Brian Wilson, in his individual capacity acting under the color of law as Road and Bridge

Engineer/ Supervisor for Montrose County, Colorado

Board of Montrose County Commissioners, Montrose, Colorado in their official capacity

Kathleen Ozga, in her individual capacity acting under the color of law as Northern Division

Lands and Recreation Group Chief, Upper Colorado Region, Western

Colorado Area, Bureau of Reclamation,

United States Department of the Interior

Carol DeAngelis, in her individual capacity acting under the color of law as Area Manager,

Upper Colorado Region, Western Colorado Area, Bureau of Reclamation,

United States Department of the Interior

*Defendants*

---

# COMPLAINT

---

1

# BACKGROUND

**1**. This is a civil action for relief of compensatory and punitive damages, and injunctive and declaratory relief arising from the Fifth and Fourteenth Amendment to the United States Constitution and its laws.

**2**. The Plaintiffs claim deprivation of their Constitutional Rights of Due Process, Taking without Just Compensation, and Equal Protection.

**3**. The Plaintiffs additionally claim Conspiracy between the Defendants to deprive the Plaintiffs of their Constitutional Rights of Due Process, Taking without Just Compensation and Equal Protection.

**4**. The Plaintiffs further claim a failure to prevent the deprivation of their Constitutional Rights of Due Process, Taking without Just Compensation and Equal Protection.

**5.** The actions of the Defendants resulted in a taking of the Plaintiffs' private property for public use, but the Defendants refused to ripen the claim by surveying to define what they were claiming. In addition, the Defendants, consciously and with callous indifference to the consequences, conspired with each other, leaving the Plaintiffs without procedural remedy.

# JURISDICTION AND VENUE

**6**. For Defendant Brian Wilson and Montrose Board of County Commissioners these action arise under 42 U.S.C. §§ 1983, 1985, 1986 and 18 U.S.C.A. § § 241, 242.

2

**7.** For federal employees Defendants Kathleen Ozga and Carol DeAngelis, these actions arise from a *Bivens* Action[1] under 42 U.S.C. §§ 1983, 1985, 1986, 4651; 43 U.S.C. § 421; and 18 U.S.C. §§ 241, 242, 1001, 1018, 1349.

**8.** The court has subject matter jurisdiction to adjudicate all claims in this court under 28 U.S.C. §§ 1331, 1343.

**9.** The District Court of Colorado is the proper venue for this case under 28 U.S.C. § 1391 since the Defendants performed their duties in Colorado, the subject real property is in Montrose County, Colorado, the parties reside in Colorado, and two Defendants acting under the color of law are employees of the United States.

**10.** The actions taken by the Defendants in relation to the subject property are so intertwined as to be necessary to be viewed as a whole. In what can best be described as a "marking post contest", each government responded to the actions of the other until finally agreeing to settle with each other without considering the ownership rights of the deeded property owners.

## PARTIES

**11.** Betty J. Barkman and Gerald E. Heal are United States citizens and deeded property holders of the subject property in Montrose County, Colorado.

**12.** Defendant Brian Wilson is sued individually in his official capacity as Engineer/Supervisor of Montrose County Road and Bridge. He exercised his authority in Montrose County, Colorado.

---

[1] *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971)

**13.** Under the Montrose County Standards and Specifications for Road and Bridge, Wilson had authority to cause to erect under the color of law a Montrose County road sign.

**14.** Defendant Montrose County Board of County Commissioners is sued in its official capacity for Montrose County, and for actions pursuing customs and policies of ignoring multiple due process violations by its staff, failing to prevent known current and future Constitutional violations, failing to offer post-deprivation remedy for the violations, and joining the conspiracy to deprive the plaintiffs of their Constitutional Rights.

**15.** Under Colorado law, CRS title 38, Eminent Domain, and Montrose County Standards and Specifications for Road and Bridge, the Montrose County Commissioners have the authority to institute proceedings for the taking of private property for public use.

**16.** Defendant Kathleen Ozga is sued individually in her official capacity as Bureau of Reclamation, Upper Colorado Region, Western Colorado Area, Northern Division Lands and Recreation Group Chief, for actions, in person, on the phone and in writing that with conscious intent deprived the Plaintiffs of the quiet enjoyment of their property and destruction of their investment backed expectations.

**17.** In addition Defendant Ozga conspired with Defendant Brian Wilson by negotiating an agreement to not pursue the federal claims of ownership while threatening to charge the Plaintiffs for access to their own property.

**18.** Defendant Carol DeAnglis is sued individually in her official capacity as Bureau of Reclamation, Upper Colorado Region, Western Colorado Area Manager, for actions with conscious intent in writings to the Plaintiffs and Congressman John Salazar, that deprived the

4

Plaintiffs of the quiet enjoyment of their property and destruction of their investment backed expectations.

19. The actions of all the Defendants, individually and in their official capacity, selectively took private property for public use without condemnation procedure or compensation. Their egregious actions were willful, with reckless and callous indifference, and could be predicted to result in a clouding of title to the Plaintiffs' property.

## FACTS

20. In the spring of 2005, Plaintiffs Betty J. Barkman and Gerald E. Heal (B/H) looked for property to purchase in Montrose County, Colorado to build their future retirement home. They chose the Montrose County location in order to be close to Barkman's aging parents. They planned to relocate after Heal's retirement to take care of the then 84 year old couple. (See Exhibit 1)

21. The 2.96 acre tract of property was part of a hay pasture that had been divided from a larger approximately 8 acre parcel. The division was created by using the Montrose County Land Use Regulation (section 3.11) that used fee simple property as a divider of parcels.

22. Because the division was not through the County subdivision process, B/H, in an effort of due diligence, talked to and physically visited the County departments that might have objections or unknown requirements for a building permit. Several trips were made to the Land Use Department researching the legality of the parcel, and the engineering requirements for a building and septic permit. Montrose County staff disclosed no problems.

23. A pre-purchase survey by Del-Mont Consultants was paid for by B/H.

**24.** On the advice of Dan Longcarr (Montrose County Assets and Records Coordinator), B/H made an appointment with Brian Wilson, Montrose County Road and Bridge Supervisor to discuss the un-maintained, single-lane, dirt irrigation "ditch" road on the western edge of the property. Specifically B/H asked Wilson if Montrose County was making any claim of ownership to the road. B/H stated they would not buy the parcel if the County was claiming the road. Wilson stated, "Not at this time."

**25.** To further investigate the property before purchase, B/H visited the Uncompahgre Valley Water Users Association (UVWUA) office to ask why an easement wasn't listed on the title insurance commitment for the irrigation road.

**26.** Bonnie Glover, Uncompahgre Valley Water Users Irrigation Records and Accounts, stated that the Water Users had a 35 foot easement from the centerline of the canal for maintenance and storage of the spoil from the canal. Glover said the easement just was.

**27.** In addition, Glover offered B/H a book of maps of the Montrose and Delta Canal system that showed the ditch, dividing the 3 acres out of the 8 acres, was part of the canal system and thus owned by the federal government.

**28.** On June 2, 2005, B/H bought the property located in Montrose County, Colorado.

**29.** On October 11, 2005, B/H applied for a County driveway permit using the shared access (with the original owners, the Cooper Estate) located where the ditch road intersected the paved county road, Jasmine Road.

**30.** October 20, 2005, Jim Lyon, Montrose County Field Technician, issued an address of 57446 Jasmine Road to B/H.

**Montrose County**

31. <u>January 17, 2006</u>, Montrose County Land Use Director Richard Gibbons sent a
letter to B/H stating that their property was illegally subdivided and no permits for
development on this property could be issued "until an appropriate remedy (i.e. Minor
Subdivision) has been completed and approved by the County Commissioners."

32. In a follow up phone conversation, Gibbons told Barkman that the County had
"made a mistake" by allowing the parcel of land to be subdivided.

33. <u>February 1, 2006</u>, B/H sent a letter to the Montrose Board of County
Commissioners (BOCC) giving notice of the Land Use Department's retroactive action, the
research they had engaged in before purchase of the property and the unequal application of
the Land Use Director ruling to only three property owners. There was no response.

34. B/H followed the procedures delineated in the Montrose County Subdivision
Regulations, Article XII Appeals, to file a timely appeal with the Montrose County Planning
Commission. The appeal was heard on <u>February 23, 2006</u> and sustained. By the same Appeal
regulations, the Land Use Department had a right to appeal the Planning Commission ruling
to the BOCC. Failing to do so exhausted the Land Use Department's rights to appeal and
sustained the Planning Commission's decision by the BOCC.

**Kathleen Ozga**

35. On <u>February 23, 2006</u>, Kathleen Ozga, sent a letter to Sharon Wilson, Montrose
County Abstract, with the subject of "Land Status for Montrose and Delta (M&D) Canal,
Uncompahgre Project, Colorado". In it she stated "It is the Regional Solicitor's opinion that

the United States acquired the M&D Canal and the facilities identified in the deed in fee simple ownership." She Cc'ed the UVWUA and Richard Gibbons.

36. On February 23, 2006, Marcus Catlin, Manager of UVWUA, sent a letter to Del-Mont Consultants stating that the irrigation ditch off the CQA Lateral, that divided the 8 acre parcel, is named C 13 and part of the of the CQ system.

### Brian Wilson, Montrose County and Kathleen Ozga

37. A Montrose County Road and Bridge Work Order, dated March 31, 2006, was issued to "install street sign on Jasmine @ Shavano Valley Rd (Pepper's Garden Area)"

38. On April 7, 2006, Barkman wrote a letter to the Land Use Department protesting the County issuing a Jasmine address to their southern neighbor, the Helblings. Addressing off the County road (Jasmine) to the north, instead of the adjacent-to-the-property County road to the south (Jefferson), permitted the Helblings to traversed two pieces of private property (B/H and Cooper) by using the ditch road. No response to the letter was received.

39. On May 1, 2006 Montrose County Assessor, Theresa Bacus, sent a 2006 Real Property Notice of Valuation that changed B/H's property tax classification from agricultural to vacant land. B/H filed a timely appeal stating that the property was still under agricultural use by the prior owner, fourth generation rancher Leo Cooper.

40. On May 4, 2006 a Road and Bridge Department Work Order Pre Close Detail shows the installation of the Shavano Valley Road sign.

41. May 4, 2006, Loree Self, Montrose County Geographic Information Systems (GIS) sent a packet to B/H changing their address from Jasmine Road to Shavano Valley Road. Included was a Notice of Address Correction signed by the Chairman BOCC, Alan Belt.

8

**42.** The Belt letter stated,"Emergency responders rely on addresses to locate persons in need of assistance. In an emergency situation minutes even seconds can mean the difference between life and death or permanent disability. ... It is the goal of Montrose County to ensure that all residents can be located quickly and without undue delay by Police, Ambulance, Fire Department or other agencies in the event of an emergency." (Exhibit 2)

**43.** The dispatch route for the original Jasmine address was a direct route using paved State and County roads. The new Shavano Valley Road address sent responders west on Spring Creek Road, a much longer route along an unpaved road with multiple right angle section corners until arriving at the intersection of Shavano Valley Road and Kiowa Road, where Shavano Valley Road ends. The dispatcher said at that point, because the address number was higher, the responders would wind around to the north until they found it.

**44.** May 31, 2006 a red flag appeared on B/H property card stating "POSSIBLE ILLEGAL SPLIT AS PER DEED 734480 CHECK WITH ASSESSOR BEFORE TRANSFERING DO NOT ISSUE PERMITS UNTILL (sic) THRU LANDUSE (RED)."

**45.** No notice was given to B/H of this action and they remained unaware of the County prohibition on permits for their property until January 2008.

**46.** June 29, 2006 Montrose County Assessor Theresa Bacus issued a Notice of Determination for 2006. The notice was given after Bacus knew, or should have known, that the actual value of the property was now zero due to the red flagged property card and that the County was claiming a public use for a road on a potion of the property.

**47.** June 30, 2006, new Land Use Director, Steve White, sent a letter to Del-Mont Consultants about their land surveys using canal or ditches to divide land. He referenced the February, 2006 Planning Commission hearing.

**48.** August 4, 2006, Steve White sent to B/H the identical letter they had received from his predecessor Gibbons in January, stating that they (County) would not issue any permits, etc. The letter was Cc'ed to "GIS, Co. Attorney, Co. Assessor, Co. Asst. Planner.

**49.** In a follow up phone conversation, S. White claimed to have no knowledge that this issue had already been appealed and sustained. ( See #46)

**50.** August 8, 2006, S. White sent a letter to Ozga taking issue with the canal surveys being a single line with no reference to width and so consequently they do not create a legal subdivision of land according to Montrose County Subdivision Regulations.

**51.** August 9, 2006 in a phone call with B/H, S. White stated that they are working through issues of canals dividing property. S. White declared that the County is willing to sue the Feds to get a determination of ownership. Additionally, he told B/H that the February appeal should not have gone to the Planning Commission because it was not their jurisdiction and the appeal is not finalized until it goes to the Commissioners. (See #34)

**52.** B/H sent a letter with all the support documents to S. White. B/H also included a request for a new appeal hearing in order to preserve their rights.

**53.** August 15, 2006 Barkman called Kathleen Ozga and requested to be informed of rulings and findings by the District Office related to the canal ownership.

**54.** August 30, 2006, S. White returned a phone call to B/H and stated that the "big meeting" planned with the Bureau of Reclamation had been postponed.

**55.** After discussion with the County Attorney, S. White had decided not to challenge the Planning Commission ruling. He would work with B/H as a "special case". S. White agreed to write a letter stating that B/H's rights to future appeal would not be affected by his not scheduling a Planning Commission hearing. "The previous Planning Commission decision will stand."

**56.** <u>August 31, 2006</u> Ozga emailed Barkman to say that "Our attorney's (sic) have requested that we do some additional courthouse research regarding ownership of the Canal facilities prior to 1908 (when the United States purchased the facilities). In addition, we are waiting to hear from the Uncompahgre Valley Water Users Association regarding their interpretation of ownership and width of the facilities."

**57.** <u>September 15, 2006,</u> B/H wrote to S. White asking for the promised letter. (#55)

**58.** Having no response from S. White, on <u>September 20, 2006</u> B/H left a voicemail for County Manager Joe Kirby, requesting an appointment to discuss stalled land use issues. Administrative Assistant Sandy Nelson called saying Kerby couldn't meet with B/H.

**59.** In a letter to B/H, postmarked <u>September 20, 2006,</u> S. White stated "At this time we will not be taking any actions on the legal status of your property. If that status changes this department will notify you of any changes and you will have the opportunity to appeal County Land Use Actions regarding your property."

**60.** S. White failed to mention the red flag he had posted on the B/H property card on 05/31/2006 and failed to remove it. (#43)

**Kathleen Ozga, Brian Wilson and Montrose County**

**61.** September 7, 2006, Ozga emailed an update to Barkman. It stated "…The Uncompahgre Valley Water Users Association (our managing entity for the projects) wants to meet with us and our attorney in person to discuss the issues and ownership of the Canal facilities. …After we meet with the Association's Board, we hope to schedule a meeting or conference call with Steve White and the Montrose County Attorney to discuss our ownership determination and hopefully come to a resolution."

**62.** September 9, 2006 through October 25, 2006, Barkman and Ozga exchanged emails; Ozga claimed a position letter from her boss, Ed Warner, Resources Division Manager would be forthcoming.

**63.** October 02, 2006, Ozga emailed, "Betty – no need to stop by. We meet (sic) with the Uncompahgre Water Users Board last Tuesday. They shared some information with us that we need to discuss with our attorney which we plan to do this Thursday. We are getting close to being on the same page with Uncompahgre Water Users – almost there. Kathleen"

**64.** October 25, 2006, Ozga emailed to B/H a copy of the letter from Warner to S. White. In the letter, Warner references the 1908 deed in which the United States purchased the M&D Canal. He stated "Reclamation has verified the deeds contain language which establishes the conveyance of fee simple interest to the United States for both canals and associated facilities which are specifically identified in the deeds." He further stated, "In conclusion, we have verified that both deeds convey a fee simple interest to the United States in the previously mentioned canals and associated facilities, including, but not limited to

siphons, headgates, laterals, drain, and operation and maintenance roads, etc. and all requirements for legal and actual notice to the public have been met."

65. The actual wording from the 1908 deed, B 102, P 329, is as follows "together with all headgates, extensions, enlargements, laterals, feeders, flumes, buildings, and other structures, rights of way, franchises, priorities and all property and rights both real and personal in any way pertaining to or used in connection with said irrigation system or any part thereof..." Warner substituted "operation and maintenance road" for "rights of way".

66. The language at the bottom of the same page. "...it being understood that as to a portion of the rights of way conveyed, the rights of the party of the first part is not evidence by formal deed of conveyance but rests upon uninterrupted and undisputed possession and used for at least twenty (20) years..."[2]

67. October 26, 2006, Barkman emailed Ozga to ask if there would be a meeting with affected land owners, Ozga and the County.

68. October 31, 2006, Ozga sent a letter to Barkman, Cc'ed to S. White and Catlin. "In summary, the United States owns in fee simple the CQA Lateral and its associated facilities, including the O&M road. Information pertaining to the width of the laterals and associated O&M road can be obtained from the Association."

69. October 31, 2006, Ozga barred the owners from use of their own property. "As a reminder, the use of the Reclamation's O&M roads by anyone other than the Association is generally prohibited."

---

[2] 42 USC 4651 (8) (9) No Federal agency head shall intentionally make it necessary for an owner to institute legal proceedings to prove the fact of the taking of his real property.

13

70. <u>January 16, 2007</u>, B/H made the 300 mile round trip to Grand Junction to meet with Ozga who copied their survey and deed. She stated that B/H would need a lease and rental payments to use the O&M road on their property as a driveway.

71. Ozga stated that Reclamation didn't have the money for a survey.

72. Barkman asked to be included in meetings that discussed their property and Ozga told B/H they could not attend, but she would keep them informed of developments.

73. <u>January 22, 2007</u>, a handwritten note from the Road and Bridge Department stated, "Steve Coverly of Bureau of Reclamation 248 – 0665 Question the road off of the CQ Lateral that we put up sign on "Shavano Valley Rd " Told him we considered it unmaintained public access  Public had used & acquired a prescriptive right".

74. <u>January 29, 2007</u> Ozga called B/H to report on the meeting with the S. White, Bob Hill (Montrose County Attorney) and Catlin. The Water Users said the rights of way are an easement but "Reclamation lawyers needed to lay claim to the entire width and expand to include the O&M road." The final decision had been sent to the Regional Director, Rick Gold.

75. Ozga also reported that after a site visit to B/H's property and seeing the C13 ditch, Reclamation now did not wish to claim the natural wash as part of the canal system. Barkman warned that such a decision could re-ignite illegal parcel problems with the County; that Glover had shown B/H a map proving ownership before they purchased the property.

76. Ozga also stated Reclamation's intention to create a metes and bounds description of the prism of the canals.

77. <u>February 21, 2007</u>, Glover told Barkman that the UVWUA had received notice from Reclamation that easements should be represented as ownership of the right of way.

14

**78.** July 11, 2007 S. White received a copy of a letter Ozga wrote to the property owner to the east, along the C13 ditch. The letter reveals a confusion of lateral names and road locations, but appears to abandon the C13 Lateral that was the basis for the parcel creation.

**79.** S. White forwarded a copy by mail to B/H with a one inch tall, red "FYI" with hand-drawn highlights and underlining added, but no comment.

**80.** B/H viewed the letter as providing all parties with their currently stated needs. One, the County no longer needed to worry about an easement width between the two parcels of land - their stated basis for the illegal subdivision decision. Two, Reclamation would not be liable for flood damage from the wash. Three, the property owners could move forward with their investment-backed expectations.

### Plaintiffs

**81.** The only outstanding issue was ownership of the road. Reclamation was committed to pursuing their claim and thus B/H would be protected from a claim by the County. The last contact with S. White had indicated that he would work with B/H as a special case on the legality of the parcel issue. The letter from Ozga gave him the option of not creating precedent for other properties – his special case.

**82.** August 31, 2007 Heal retired and B/H began final preparations to list for sale their current home, build their retirement home on the Montrose property and provide assistance to Barkman's eighty-six year old parents.

### Kathleen Ozga, Carol DeAngelis, Brian Wilson and Montrose County

**83.** September 19, 2007 Ozga sent a letter to Montrose County Engineer/ Road Supervisor and Cc'ed Olathe Road and Bridge, Montrose Road and Bridge, Marc Catlin,

Steve White, Barkman and Heal, James and Carol Helbling, Wissel/Gailey Properties and the Mildred E. Cooper Trust. The subject of the letter was the O&M road between Jefferson and Jasmine Road In the letter, she stated "The United States fee title ownership for the CQA Lateral extends 35 feet from the centerline on each side. The ownership interest also includes the operation and maintenance road which parallels the lateral and has been designated by Montrose County as a 'no maintenance provided-public access road.' The use of Reclamation's operation and maintenance roads, especially when those roads are owned in fee title by the United States, by anyone other than the Association is prohibited."

**84.** Ozga went further to request that Montrose County remove the Shavano Valley Road sign or the Association would do so and install "no trespassing" signs. They would install locked gates if necessary. She went on to say that even adjacent landowners were not authorized to use the road without permission, and "Said approval is not automatic..."

**85.** September 21, 2007 Carol DeAngelis, (signed by Susan M. Fay,) sent a similar letter to B/H which Cc'ed Catlin and S. White. It stated "After conducting additional research and consulting with the Office of the Solicitor, Reclamation verified that the 1908 deeds for both canal systems conveyed fee title ownership to the United States, however, *the width of the ownership was not defined*. Thus pursuant to the 1908 deed, the United States has determined that its fee title ownership for the CQA Lateral, which is adjacent to your property, extends *35 feet from centerline on each side*." (Italics added) She added that someone from her staff would be contacting B/H about a license agreement.

**86.** September 26, 2007 Barkman sent Ozga an email in protest and followed with a letter on October 3, 2007. She pointed out that the 1908 deed states "rights of way". She

questioned whether Reclamation was attempting to claim possessory interest without a judiciary determination and pointed out that Montrose County collects property tax from B/H on the property Reclamation was now claiming. Catlin and S. White are Cc'ed. No one responded.

**87.** October 19, 2007 Dan Longcarr, Assets & Records Coordinator for Montrose County, responded to Ozga, Cc'ed Wilson. Longcarr pointed out the wording at the bottom of the 1908 deed page that references rights of way. He also added deeds from 1911 and 1913, north and south of Kiowa road, where the United States purchased in fee simple land that had been a right of way at the time of the1908 canal purchase.

**Plaintiffs**

**88.** On January 28, 2008, Barkman checked the online Montrose property card and found the red flag under Remarks with an entry date of 5/31/2006.

**Montrose County and Brian Wilson**

**89.** Barkman called S. White to remove the flag. Déjà vu of 2006, S. White again took the position that the Planning Commission did not have the authority to decide the issue, that he would work with B/H, would talk to the County attorney and a date was set for a conference in Montrose.

**90.** February 8, 2008, B/H drove the 100 miles each way to Montrose. S. White had not met with the county attorney or created a document for B/H to sign. S. White repeated his statement that the County had changed its position.

**91.** B/H recited their problems with the ditch road, its use by the adjacent neighbor, the address change and the road sign. S. White claimed those issues to be Engineering's problem

17

and they might require a right of way for Shavano Valley Road to settle the plat filing that S. White was requiring of B/H to declare their lot legal.

**92.** February 11, 12, 2008, B/H called Montrose County Manager Joe Kerby's office to schedule an appointment. Executive Secretary to the Board, Sandy Nelson stated that "Steve has forgotten or believes that we have forgotten."

**93.** February19, 2008 Barkman sent Kerby a seven page history with twenty three support documents by priority mail.  The Delivery Confirmation Receipt shows the packet was delivered February 21, 2008, 10:48 AM.

**94.** February 21 & 26, 2008 Barkman left a voicemail messages for Kerby asking for follow up. February 25, 2006 Barkman sent Kerby an email.

**95.** February 27, 2008 Kerby stated that he had not received the priority mail packet. He would meet with Land Use, the Attorney and confirm a meeting by the end of the week.

**96.** By March 5, 2008, Kerby still had not called B/H. Barkman called Nelson to request a meeting. Nelson said she would check Kerby's schedule and call back.

**97.** March 6, 2008, 2 PM Nelson called B/H to say a meeting was scheduled at 3 PM the following day and would include S. White.

**98.** March 7, 2008, B/H traveled to Montrose to meet with Kerby, S. White and Jon Waschbusch, Montrose County Senior Planner. Kerby began with a statement that this situation is not a result of any mistake on B/H's part and that he had asked White and Waschbusch to craft a solution.

**99.** Waschbusch proposed using the exempt subdivision statutes to meet legal requirements to legitimize the property. All fees would be waived except for an access permit,

a boundary plat and a paid tap fee. B/H asked if their pre-purchase survey could be used and
were told it would require a new title and signature line for the Board approval and so a new
survey would be required.

**100.** S. White voiced the opinion that the Bureau had never owned the C13 Lateral and
that he had never received a letter from Ozga saying to remove the Shavano Valley Road sign.

**101.** B/H agreed to provide their pre-purchase survey, the Ozga letter about the sign
removal (#83) and to meet in two weeks to discuss the road issue separately.

**102.** March 8, 2008 Barkman sent the letter to Kerby including three photos of the ditch
road showing the sign and the deep ruts resulting from the public driving on the winter mud.
Barkman's letter included a review of the meeting and a discussion of the County paying
expenses for the new survey. Barkman invited County personnel to the site to understand the
primitive nature of the road the County was arguing over.

**103.** March 11, 2008 Barkman sent Kerby a letter and email of the same asking if the
County would be paying the surveyor.

**104.** March 16, 2008, Kerby emailed B/H to say he couldn't commit to paying the
survey costs and that Nelson would be in touch about scheduling the next meeting.

**105.** March 28, 2008 B/H traveled to Montrose to meet with Kerby, Waschbusch and
Brian Wilson, Engineer/Supervisor of Road and Bridge. Kerby read S. White's letter of
March 27, 2008 to B/H. The letter stated that Montrose County was doing B/H a favor to
remedy the situation for less than the $10,000 that they could have charged. Instead to make
the lot legal, B/H would only be charge for the survey, recording fees and access permit.

**106.** Kerby stated that the County's position was that the Planning Commission did not have authority to make their determination while also admitting that B/H had followed correct procedure for the appeal. On that basis, they (County) were justified in red flagging the property. Further, their interpretation of the Ozga letter was that Reclamation was saying that they had never owned the C13 Lateral.

**107.** Brian Wilson presented documents in support of his claim for the existence of Shavano Valley Road that he claimed predated the 1908 purchase of the canal by the United States. Waschbusch asked Wilson if he was claiming an easement or fee simple ownership. Wilson replied "an easement." In answer to why B/H's deed did not show an easement to the County, Wilson stated that there was a period of time in which there was a failure to record.

**108.** Under questioning by B/H, Wilson resisted removing the Shavano Valley Road sign and talked of a 60 foot right of way. He couldn't say how the 60 feet would be located in relation to the existing canal.

**109** April 1, 2008 Barkman emailed Wilson with a summary of the March 28 meeting in relation to road issues and suggested a date for a site visit. Secretary Kathy scheduled a visit at the B/H property on Friday, April 4.

**110.** April 4, 2008, Wilson arrived 45 minutes late. Wilson stated that he didn't think B/H should have to pay for a survey and that he would argue behind the scenes for the County to pay for a whole survey from Jefferson to Jasmine.

**111.** Wilson used the existing B/H survey to locate corner pins. After looking at the property Wilson said he didn't see the County ever needing the road on "his shift".

112. After examining the location of the Helbling house, the B/H barn and trees, Wilson stated that he would be recommending a 40 foot easement for Shavano Valley Road and that the easement would be included in the survey plat in order for it to be filed and recorded.

113. Barkman expressed concern for the liability created by the County erecting a sign on an un-maintained single lane dirt road. Wilson claimed that the liability was the County's and expounded on his opinions of governmental immunity and Thomas Jefferson.

114. April 6, 2008 Barkman emailed Wilson with a recap of the meeting.

### Plaintiffs and Montrose County

115. May 1, 2008, B/H filed a protest of their 2008 property tax.

116. May 22, 2008 B/H sent a letter to Kerby requesting an opportunity to bring their issues before the BOCC. Barkman stated that it was not possible to give the County an easement for land that was already under easement to Reclamation. To do so would only cloud their title further. She also pointed out the County had the free option to just remove the red flag. No response.

117. June 2, 3, 2008 Barkman left messages for Nelson, asking to be put on the BOCC's agenda. There was no call back.

118. June 5, 2008 B/H visited Nelson's office to request in person a spot on the agenda. Nelson did not commit to a date.

119. June 15, 2008 B/H traveled to Montrose to speak to the Commissioners in the 9 am Open-to-the-Public Section of the BOCC agenda. They presented the Commissioners an abbreviated written history of events and asked for an agenda spot in the future. The BOCC directed Kerby instead to schedule a Land Use Work Session for July 3.

### Kathleen Ozga

**120.** <u>June 17, 2008</u> Barkman emailed Ozga with an update on County actions and an invitation to join B/H at the scheduled July 3rd work session to clarify Reclamation's position. Barkman included a copy for Ozga of the history hand-delivered to the Commissioners.

**121.** <u>June 20, 2008,</u> after talking to Mary Lou Cooper and Catlin, Ozga emailed Barkman to say that all were in agreement that "we do not want the operation and maintenance road designated as a County road." Ozga Cc'ed Bob Levine, Reclamation Real Estate Specialist.

### Montrose County, Brian Wilson and Kathleen Ozga

**122.** <u>July 3, 2008,</u> the work session was attended by Commissioner Alan Belt, Commissioner Bill Paterson, County Manager Joe Kerby, County Attorney Bob Hill, County Land Use Director Steve White and County Road and Bridge Engineer/ Supervisor Brian Wilson and by Betty Barkman, Gerald Heal and Barkman's eighty-seven-year-old parents. Commissioner Gary Ellis was absent..

**123.** Wilson read a letter sent by Ozga stating Reclamation's ownership of the O&M road, requesting removal of the Shavano Valley Road sign and threatening removal of the sign, no trespassing signs and locked gates.

**124.** Barkman gave a written copy of the issues to most of those in attendance.

**125.** The presentation listed three points asking for remedy – the legality of the lot including the red flag, the tax consequences of the reclassification to vacant land with the red flag, and the address and ditch road problems.

**126.** Barkman argued that according to 2006 Montrose County Land Use Regulations, B/H's appeal to the Planning Commission was the correct course of action. The failure of the Land Use Department to appeal to the commissioners had sustained the Planning Commission decision. Montrose Attorney Hill said, "She's right."

**127.** In spite of their attorney's opinion, Commissioners Belt and Patterson continued to discuss the necessity of an exempt plat filing with a road easement.

**128.** The Commissioners stopped Wilson from presenting his evidence for County ownership of the road.

**129.** Wilson stated that he was claiming an easement and that he felt B/H should pay for the survey. Barkman said, you want us to pay for a survey so you can then take our property? Wilson said yes. Wilson had brought a quit claim deed for the easement for B/H to sign.

**130.** B/H refused to sign and reiterated that their position was that they couldn't grant an easement to the County for land that was under easement to the US and they didn't want to have a County road on their property. Barkman stated that requiring a road easement to remove a retroactive determination of illegality was extortion.

**131.** Attorney Hill stated if the County believes it has a claim of ownership, the correct course of action is to have the County, the Bureau of Reclamation and the land owners go to court and let a judge decide. Commissioner Belt stated that we are not going to court with the United States. Heal asked Belt if he was going to court with us? Belt did not respond.

**132.** S. White continued to promote the theory that the red flag was appropriate because Reclamation had declared that they didn't own the intervening ditch that had been used to

separate the B/H and Helbling property. The red flag was posted May 31, 2006. The first
Ozga letter about the C13 ditch was written over a year later on July 11, 2007.

133. After an hour and forty five minutes of discussion, Patterson turned to Wilson and
said, "They aren't going to give you an easement." The decision was made by the two
Commissioners to have staff draft a document for them to sign at the next commissioner
meeting, declaring the B/H property to be a legal lot.

134. As to the sign, they would not tell Wilson to take it down.

135. The tax issues would have to be handled by the assessor's office.

136. After the meeting, a visibly angry Wilson approached B/H and followed them
outside. When asked if he intended to take down the sign or have the Water Users do so, he
responded that if Kathleen Ozga tries to remove the sign, he will have the sheriff arrest her.
He had made sure the sign was installed in the County right of way.

137. Wilson further stated that as to the B/H property, he would "just take it."

138. July 7, 2008, the BOCC passed a motion that the Planning Commission appeal was
final and that the owners could apply for a building permit in accordance with County
regulations. He added, "…however, nothing in this decision shall be construed or interpreted
as a waiver of any right or interest that Montrose county has or may have to existing or
historical road right of way, including the Shavano Valley Road."

139. B/H were told that they would be required to do the legwork to now remove the red
flag. They hand-delivered a copy of the BOCC decree to the property tax office.

**140.** July 14, 2008, a computer check showed the red flag had been removed after 25 months. Since the February 2006 Planning Commission decision, all the multi-departmental County actions based on an illegal parcel declaration had been unsupported legally.

**141.** July 22, 2008, a Montrose County Board of Equalization meeting was held for B/H's 2008 property tax appeal. The hearing was before referee, John Nisley, with Montrose County represented by Assessor Brad Hughes and Teri Warner. During the taped hearing when asked where in the Colorado statutes Hughes derived the authority to reclassify the property based on size and amount paid, Hughes stated that there was none, that the law was weak so we made an internal decision.

**142.** July 28, 2008, the Montrose BOCC sent a denial notice in a Decision on Appeal to B/H. It stated that the "Petitioner was not present for the hearing."…"That the actual value upon improvement was made in accordance with Colorado statutory and case law."

**143.** August 19, 2008, after written protest of the attendance error in the Montrose Decision on Appeal, Sandra Nelson sent B/H an amended corrected notice. It was signed by Montrose Chairman Gary Ellis and Clerk of the Board, Francine Tipton-Long.

**144.** August 27, 2008, B/H filed a Petition to State Board of Assessment Appeals (BAA) for tax year 2008. The hearing was set for June 25, 2009.


**Plaintiffs**

**145.** August 1, 2008, B/H listed the Montrose property for sale for $145,000. They included a disclosure of the road issue including the July 3, 2008 Reclamation letter. The one year contract expired with no offers.

25

**Kathleen Ozga and Brian Wilson**

146. August 15, 2008, Ozga left B/H a voicemail message with email follow up,
informing them of an upcoming meeting with Wilson. Barkman responded with a voicemail
message requesting to be included in the meeting. Ozga's voicemail reply stated because it
was Wilson's meeting, she didn't have the authority to invite B/H.

147. Barkman called Wilson's office and secretary Kathy said Wilson would return the
call by first thing Monday morning, August 18th. Wilson never called.

148. August 16, 2008, believing Ozga was shielding B/H from the County's claims,
Barkman emailed Ozga with a more in depth report of the July 3rd work session and the
current state of affairs.

149. August 20, 2008, Secretary Kathy called B/H to report that the meeting will happen
Thursday (21st) and she made a special effort to state correctly Wilson's message that the
meeting was "between two agencies – a closed meeting."

150. August 21, 2008, Barkman emailed Ozga with a report of her phone conversation
with Wilson's secretary and a request for Ozga to give B/H a report of the meeting.

**Plaintiffs**

151. August 25, 2008, Barkman was wakened in the middle of the night with acute
disabling vertigo. No cause has ever been determined and Barkman has never fully recovered.

**Kathleen Ozga and Brian Wilson**

152. September 24, 2008, Ozga called B/H with Bob Levine on the phone with her.
Ozga explained that Levine had been the person that had attended the meeting with Wilson on

August 21, 2008. Levine reported that Montrose County was claiming a prescriptive easement

to the O&M road between Jefferson and Jasmine.

153. Ozga had talked to Catlin, UVWUA, and he was okay with the County claim. He

was not interested in fighting the County.

154. Ozga had decided they would not go to court and would create a "Contract and

Grant of Easement" document to grant use of the road to the public for 35 feet from the

centerline of the canal as it currently sits.

155. Levine cited Wilson's presentation of 1930s transportation maps and a petition and

plat map that showed Shavano Valley Road to the west of where the County was claiming it

to be currently. Levine chuckled at Wilson's claim that "roads migrate."

156. Barkman reminded Ozga that the ownership of the land they were granting an

easement to was in question and they could not give an easement for land they did not own.

157. Barkman also noted that the road in question probably ran outside the 35 foot

boundary in some locations and would there be a survey? Ozga stated yes.

158. Barkman asked Ozga, what are you getting in exchange for the easement? Ozga

answered "Nothing. It is just easier."

159. September 30, 2008, Barkman emailed and sent a written copy of a synopsis of the

events leading up to and the contents of the September 24 phone call with Ozga and Levine.

She asked Ozga to add or correct the information. Ozga responded, "Your summation appears

to be correct."

**160.** Barkman responded by email the same day and asked for a statement of position to use as a disclosure for the property listing. There was no reply from Ozga and no further contact between B/H and Ozga until December 11, 2009.

### Brian Wilson and Montrose County

**161.** <u>September 30, 2008</u>, B/H called Wilson's office to request a copy of the map Wilson showed to Levine. Secretary Kathy called back to say Wilson didn't know what map B/H were referring to.

**162.** <u>October 2, 2008</u>, B/H traveled to Montrose to review Road and Bridge documents. While B/H were examining the file, Wilson spoke to them for a few minutes. Wilson claimed not to know who Bob Levine was or when he had met with him. B/H asked Wilson to show them which map he had used for his road migrating claim. Wilson suggested a possible map and added, "I'm telling the truth."

**163.** B/H were allowed to copy, with cost, any file they requested.

**164.** <u>October 16, 2008</u>, B/H traveled to Montrose for an appointment with Montrose County Commissioner Gary Ellis B/H informed him of the new-since-July situation of Wilson conspiring with Ozga on a road easement. Ellis handed B/H off to Commissioner Belt saying Belt represented the section of the district where the property was located.

**165.** The two commissioners asked each other whether Wilson had the authority to make deals with Reclamation without their approval and thought he didn't. Belt said he would look into the situation and call B/H.

**166.** Belt asked B/H what they wanted to him to do. B/H responded that they wanted removal of the sign, restoration of the Jasmine road address and vacation of the road.

**Plaintiffs**

167. October 21, 2008, Barkman's father had his first heart attack.

**Montrose County and Brian Wilson**

168. November 17, 2008, B/H called Commissioner Belt. Belt's statement to B/H was "right or wrong, they will come up with a decision." He would talk to County Attorney Hill.

169. November 24, 2008, B/H left message for Belt asking for an update. No response.

170. December 8, 2008, B/H called Belt. Belt stated that Wilson should have sent a letter to B/H with the County claiming the property. B/H asked Belt what would be the benefit to the County? Belt said, they were not going to court with the Bureau. They were already spending too much in court and he thought that the letter would keep B/H from bringing it up.

171. B/H repeated their position that they had a deed and that governments do not have the right to take private property without due process, just compensation or compelling need.

172. B/H repeated their request for the three actions requested on October 16th and added a request to bar Wilson from taking the property without going to court. Belt said he would visit the property with Wilson and get back to B/H.

173. December 16, 2008, B/H called Belt for a report on the site visit. Belt stated, we talked it over and are not going to do anything about the property. He said, you don't even have a house there.

174. Belt further stated that the County Attorney says it is not a problem. There are many un-maintained roads in the County. "This is not a seat of the pants decision." He had discussed this individually with each of the other commissioners.

**175.** B/H requested a space on the Board's agenda to get a statement of position from the Board. Belt stated that he did not think that the issue warranted a commissioner's meeting.

**176.** December 19, 2008, B/H sent Belt a letter, Cc'ed Commissioners Ellis and Patterson, summarizing the December 16th phone call and requesting a written statement of position. No one responded.

**177.** December 22, 2008, B/H filed a Petition for Abatement or Refund of Taxes for tax years 2006 and 2007 with Montrose County. Pursuant to Colorado Statutes, Montrose County was required to hold a hearing on the petition within 6 months.

**178.** January 26, 2009, B/H sent a letter to Attorney Hill (Cc'ed Commissioners Ellis, and new Commissioners David White and Ron Henderson) that B/H had not received a statement of position and asked the new Board for one; that failure to respond would be assumed to be an authorization by the current Board of Wilson's actions. In conclusion, "We hope that you will take time to review with the new commissioners the requirements of due process, just compensation and compelling public need for taking private property for public use and the job description for the County Road and Bridge Engineer."

**179.** February 5, 2009, a letter from the office of the Montrose County Attorney (Cc'ed to Montrose County BOCC, County Manager Joe Kerby, and Brian Wilson, Public Works Director) stated in its entirety:

"Re: Shavano Valley Road

Dear Ms. Barkman and Mr. Heal:

Thank you for your letter dated January 26, 2009. Pleased be advised that Shavano Valley Road has a long standing history as a public road under Montrose County jurisdiction. The

30

evidence of that history is available for public review at the Montrose County Public Works Department."

Signed by: Robert J. Hill, Montrose County Attorney.

**180.** On <u>February 10, 2009</u>, B/H sent a letter to Hill thanking him for informing the new County Commissioners of the situation.

### Montrose County

**181.** <u>May 18, 2009</u>, the Montrose BOCC, without prior notice to the Plaintiffs, held a hearing on the B/H Abatement Petition for tax years 2006 and 2007. According to Nelson's minutes, the presentation for the hearing was by Assessor Brad Hughes. [3]

**182.** <u>May 26, 2009</u>, Sandra Nelson mailed a notice of the Board's decision to deny the abatement appeal for 2006 and 2007. It was the first notice to B/H about the hearing.

**183.** <u>May 28, 2009</u>, B/H filed a County appeal of the 2009 tax year.

**184.** <u>June 1, 2009</u>, B/H sent Nelson a letter stating that they had not received notice of the May 18 hearing and requesting a correction of the record.

**185.** <u>June 3, 2009</u>, The Colorado Board of Assessment Appeals (BAA) docketed B/H's request for an appeal of the Montrose County Denial of Abatement for 2006 and 2007.

**186.** <u>June 5, 2009</u>, Nelson sent a letter to B/H claiming that she had sent notice of the hearing and gave a copy of a letter dated May 8, 2009. She Cc'ed the County Manager, the County Attorney, the County Assessor, JoAnn Groff of the Colorado Division of Property Taxation and the Commissioners individually.

---

[3]CRS 39-1-113. (1), (5) Abatement and refund of taxes

**187.** An open records request to Nelson for all notices sent to Abatement Appellants notifying them of hearings in 2009 revealed that notice of hearing did not become standard practice until after B/H's hearing. Nelson had no proof of mailing for the B/H notice.

**188.** June 25, 2009, the State Board of Equalization hearing for tax year 2008 was held with Montrose County represented by Carolyn Clawson, Assistant County Attorney and Assessor's Office, Teri Warner. B/H called Mary Lou Cooper to testify to their family's continued agricultural use of the property since the 1920s.

**189**. June 30, 2009, Montrose Assessor Hughes denied B/H's protest for 2009 taxes saying the property does not meet the qualifications for agricultural classification.

**190.** July 21, 2009, the Montrose County Board of Equalization heard B/H's protest of 2009 property taxes. James Isler presided and Teri Warner made the Montrose County presentation. During Warner's presentation she said, the County's position is that it is a county road, referring to the O&M road. No adjustment had been made for public use.

**191.** August 3, 2009, Commissioner Chairman David White signed a Decision on Appeal to deny B/H's appeal of tax year 2009.

**192.** August 6, 2009, the State BAA issued an Order Retaining Jurisdiction that "the 2008 classification of the subject property should be irrigated farm land." The County was ordered to provide to the State Board a 2008 actual value of the land within 14 days.

**193.** August 14, 2009, B/H traveled to Montrose for a meeting at their request with County Attorney Bob Hill to discuss the property tax appeals and the road issue. . Hill asked Assistant Attorney Clawson to sit in on the meeting.

**194.** Hill asked if B/H had an attorney. When they responded that they were representing themselves, Hill replied that they needed a new hobby.

**195.** B/H reviewed the long history of property tax issues and discussed the possibility of Montrose stipulating to the remaining years now that the State had ruled that the property was agricultural. Barkman reported that Hughes said he would stipulate to 2007 and 2009, but not 2006. B/H asked the attorneys to discuss the issue with Hughes.

**196.** B/H next discussed the road issue and told the attorneys that at the current state of impasse, their next move would be to file in federal court. The inclusion of federal employees as an indispensable party defined the venue.

**197.** Hill stated that Wilson believes that the road is historical, never vacated and existed before the US claim.

**198.** B/H presented their belief that Wilson was not accurately presenting the facts and asked the attorneys to advise the Commissioners as such.

**199.** B/H stated their evidence for ownership, questioned the value of the property to the County, the actions of Wilson that had clouded their title, their listing of the property for sale and their belief that Wilson's actions amounted to conspiracy to deprive B/H of their constitutional rights. B/H ended with a statement that Wilson's claim depended on a belief that it is possible to adversely possess federal property.

**200.** August 18, 2009, Montrose County Treasurer, Rosemary Murphy, sent an abatement check to B/H prior to an approval of a property value by the State BAA.

**201.** August 24, 2009, B/H filed a petition to the State BAA for the 2009 tax year.

**202.** This left a tally of 2008 decided in favor of the Plaintiffs, but waiting for a ruling

from the State on value, and 2006, 2007, and 2009 waiting for a state hearing date.

**203.** September 17, 2009, the State BAA ordered Montrose County to classify the

subject property as agricultural irrigated farm land with the value proposed by Hughes and for

the Assessor to change his records accordingly. B/H finally cashed the check.

**204.** September 22 – December 14, 2009, B/H worked with Clawson and Hughes to

resolve stipulation agreements for 2007 and 2009.

**205.** December 24, 2009, Clawson moved for dismissal of tax year 2006 for lack of

subject matter jurisdiction.

**206.** December 31, 2009, B/H responded to Clawson's Motion for Dismissal and listed

5 procedural errors by Montrose County. In addition, in their motion, Clawson used a

fraudulent 2006 Notice of Determination, signed by Hughes when he was not the assessor,

with a different date and different reason for denial of the protest from the original notice.

**207.** Clawson's response did not deny the existence of the second Notice of

Determination but instead stated "The second is a historic recreation of the original Petitioner

ownership and valuation data by computer using the current Assessor information."

**208.** In a later discussion, when Hughes asked Barkman to tell him why this was a

problem, Hughes indicated that the original document had not been archived. [4]

**209.** January 29, 2010, the State BAA denied Clawson's Motion to Dismiss.

**210.** April 12, 2010, Hughes sent B/H a stipulation agreement for 2006. Barkman

objected to language that the BOCC had a timely hearing.

---

[4] Assessor's Reference Library, vol. 2, Administrative and Assessment Procedures 1.32

**211.** <u>April 26, 2010</u>, Hughes sent B/H a letter stating he would not change the wording and the parties are currently waiting for a hearing date even though the State has already ruled on the legal issues. Montrose County continues to retain the 2006 tax payment.

**Kathleen Ozga**

**212.** <u>December 11, 2009</u> Not having heard from Ozga since September 30, 2008, Barkman emailed her with a list of questions about the Reclamation's position on ownership for the whole canal, the basis beyond the 1908 deed for claims of ownership for the land adjacent to the CQA lateral, the status of an easement to Montrose County for the road on B/H's property and a list of affected property owners along the M&D Canal that Reclamation had notified about their change of land ownership status.

**213.** <u>December 23, 2009</u>, Ozga emailed Barkman with her response.

**214.** No authority beyond the 1908 US purchase was given.

**215.** In a change of position about her intention to issue an easement to Montrose County, Ozga replied, "Reclamation has no immediate plans to convey a road easement to Montrose County (County) since the county already believes it has a prescriptive easement and is not interested in receiving an easement from Reclamation."

**216.** As to the notified property owners, Ozga responded, "We do not have a list of all the property owners along the M&D Canal. Reclamation's involvement with landowners along the canal is limited to review of subdivision development plans during the County's review process."

**217.** <u>December 24, 2009</u>, Barkman emailed a response to Ozga. "Should I believe that this is your final answer, based on sound legal advice, and proceed accordingly?"

218. Ozga responded, "Just to reiterate, Reclamation's basis for claim of ownership has not changed regarding the M&D Canal and CQA Lateral and the Reclamation letters referenced below are still applicable." This was the final contact between Ozga and B/H.

## Montrose County

219. January 2, 2010, B/H sent D. White, Chairman BOCC, notice that Attorney Clawson had used the fraudulent 2006 Notice of Determination in the State tax appeal filing. No response was ever received.

220. March 3, 2010, B/H sent a letter to Rick Dunlap, Montrose County Sheriff, reporting Hughes' creation of a false public record. [5]

221. March 16, 2010, Investigator Thorp of the Montrose Sheriff's Department called B/H to say that they had given the case to Jack Haynes of Colorado Bureau of Investigation.

222. August 2, 2010, Haynes traveled to Crested Butte to take B/H's statement and copy documents. No determination has yet been received by B/H on whether CBI will proceed with criminal charges against Hughes.

223. March 14 2010, B/H sent an email to Congressman John Salazar, 3rd District of Colorado, and requested help with the Bureau of Reclamation. Ellen Steiner responded.

224. April 13, 2010, Steiner followed up in a phone call asking B/H what they wanted her to do. Barkman asked that Reclamation back off from the fee simple claim or go to court.

## The Plaintiffs

225. May 4, 2010, Barkman's father had his second heart attack.

226. May 10, 2010, Barkman's mother broke her leg.

---

[5] CRS 18-8-406.Issuing a false certificate and CRS 18-8-114. Abuse of Public Records.

**Carol DeAngelis**

227. June 10, 2010, Congressman Salazar forwarded to B/H the June 1, 2010 letter sent
to the Congressman with a statement of position from the United States Department of the
Interior, Bureau of Reclamation and signed by Carol DeAngelis, Area Manager. [6]

228. DeAngelis used the wording "operation and maintenance road" for rights of way.

229. DeAngelis claimed federal ownership of 35 feet from the centerline of the canal.

230. DeAngelis reported that B/H had been advised that they would need written
permission to use the road.

231. DeAngelis presented the pre-purchase B/H survey with large added notations
which incorrectly labeled the road as the canal, expanding Reclamation's claim.

232. DeAngelis claimed authority to grant an easement to Montrose County, but "In this
particular situation, the County was not interested in obtaining an easement since they firmly
believe the County already holds a prescriptive easement for the road."

233. DeAngelis stated ""Reclamation does not believe that a court process is
necessary..."

234. DeAngelis "Reclamation's involvement with landowners along the Canal is limited
to review of subdivision development during the County's review process. This level of
involvement is a Reclamation standard practice consistent with the administration of Federal
lands under its jurisdiction."

235. The Montrose County road sign still stands and a stop sign was added in 2010.

---

[6] 18 U.S.C. §1341 Frauds and swindles, § 1343 Fraud by wire, radio or telephone. 43 U.S.C. § 421, Acquisition of lands for irrigation project;
eminent domain.

## COUNTS

### Defendant Brian Wilson

**236.** Wilson is the moving force behind the actions that have resulted in this suit.

**237.** Wilson's decision to install the Shavano Valley Road sign and invite the public to trespass on private property under easement to the federal government initiated the taking of private property without due process or just compensation, and the competition for ownership between Montrose County and the Bureau of Reclamation.

**238.** Wilson knew or should have known that claims based on the 1930s HUTF maps could only be used to claim a prescriptive easement against federally owned property rights and thus be unsupportable legally.

**239.** Wilson conspired with fellow Montrose County employees to attempt to force an easement for the property in question while claiming to already have an easement by adverse possession. Either Wilson doesn't believe his own claims of ownership or he just wanted to torment the Plaintiffs.

**240.** Wilson claims the authority of a historic road that connected with the existing Shavano Valley Road, but only one Shavano Valley Road sign was installed between Kiowa and Jasmine, in a failure to give notice or treat all similarly situated properties the same.

**241.** Wilson knew or should have known that the Shavano Valley Road map that he used to claim authority of pre-dating the 1908 US purchase was actually commissioned by the Montrose County Commissioners in 1909.

**242.** Wilson knew that the 1909 Shavano Valley Road map did not intersect the Barkman and Heal property but at the closest point ran approximately 750 feet to the west, on the other side of the CQA Lateral. (See Exhibit 3)

**243.** Without legal authority to condemn private property, Wilson's actions resulted in a taking of the property and the destruction of the personal interests of the Plaintiffs.

**244.** Without public need for the property, Wilson, with evil intent, subjected the Plaintiffs to a campaign of years of harassment, depriving them of their Constitutional rights and the ability to provide consistent care for their elderly family members.

### Defendant Montrose Board of County Commissioners

**245.** The Montrose Board of County Commissioners routinely, with callous indifference, overlooked, condoned, failed to prevent the illegal actions of the Montrose County department supervisors and staff, establishing custom and policy to use whatever means they consider necessary to produce the results they seek.

**246.** Montrose County staff either does not know the laws that govern their official behavior or routinely, intentionally ignores their own policies, state and federal laws.

**247.** Notice to the Montrose Board of County Commissioners of criminal and questionable practices, decisions and actions by Montrose County staff, including an extortion scheme to take the Plaintiffs' property, resulted in the Board members ignoring the Plaintiffs and their concerns, not making offers of remedy, not preventing ongoing damages, not stating an official position for which Montrose County could be held accountable for their actions, and joining the conspiracy to deprive the Plaintiffs of their property.

**248.** Upon notice of actions by Defendant Brian Wilson, of clouding the Plaintiffs' title and conspiring to create secret agreements with Kathleen Ozga, the Montrose Board of County Commissioners chose, with adequate notice, legal counsel and alternative actions available, to join the conspiracy to deprive the Plaintiffs of their Constitutional Rights.

**249.** While the Plaintiffs were being subjected to a never-ending series of hurdles to block the use of their property, their adjacent neighbors to the south, along the same irrigation road, built and currently live in a house on their property.

**250.** At the hands of Montrose County Commissioners and personnel, the Plaintiffs were subjected to a countywide systematic campaign of bullying, abuse of power, a nightmare repetition of previously solved problems to harass, intimidate and punish for no known reason. Every effort by the Plaintiffs to solve more and more farfetched demands was met by changing the rules to suit the County and their hidden agenda.

**251.** The ongoing labyrinth of demands by County personnel resulted in an inability of the Plaintiffs to build a home on their property, to be in proximity of love ones in need of care, of Plaintiff Heal prematurely quitting his job, of not being able to list their current home for sale before the collapse of the housing market with the devaluing of the property that was necessary to fund their retirement, of acute and ongoing medical problems, and the pain and suffering of being subjected to such unwarranted, illegal and damaging actions by a governmental body in a position of trust.

### Defendants Kathleen Ozga and Carol DeAngelis

**252.** Kathleen Ozga and Carol DeAngelis proclaimed by authority of the United States to take property from the Plaintiffs without due process or just compensation.

253. Exploiting a bias toward a faith in the federal government, Ozga and DeAngelis took the Plaintiffs' property by giving notice to the Plaintiffs of a claim of fee simple ownership for land that had historically been under federal easement. The notice was sufficient to cloud the title of the Plaintiffs' property to the point that their metes and bounds description could no longer be considered valid enough to allow for the sale of the property.

254. After clouding the title to the Plaintiffs' property, Ozga and DeAngelis never surveyed what they were claiming to take, never ripened the claim of ownership or worked with the Plaintiffs to remedy the problems their actions had created.

255. Ozga and DeAngelis consciously chose not to go to court because it was easier and cheaper to conspire with Montrose County and the Uncompahgre Valley Water Users Association, then to take the steps necessary for an eminent domain action.

256. Due process for condemnation of the property would have included a required statement of need for the property that had operated effectively under an easement for 100 years and the change of ownership was resisted by the Water Users who managed the canal.

257. Condemnation would also necessitate a survey to locate the canal as it sits today. The existing survey for the canal is a series of long straight lines with pivot points. Without a survey, it is not possible to even know how the legal description of the canal relates to the Plaintiffs' property.

258. Both Ozga and DeAngelis with intent, legal advice and ample time to consider the consequences of their actions, chose the "easier" course of depriving the Plaintiffs of their property, and counting on their stated backing by the overwhelming power of the federal government to be sufficient to make the Plaintiffs give up their opposition.

259. Both Ozga and DeAngelis engaged in a selective notification of a change in ownership claim, resulting in selective notice of their stated required license and rent for the canal residents to use their own property. The edict was coercive in nature including threats to lock the Plaintiffs off their own property if they did not comply.

260. Ozga freely admitted to conspiring with Brian Wilson in closed meetings for an agreement that neither government would go to court to contest or prove ownership. The DeAngelis' correspondence reveals her knowledge of the agreement.

261. In the years since the first letter claiming United States fee simple ownership of property, both Defendants had ample time and adequate resources to understand the illegal nature of their actions. They could have reconsidered. They could have refused to participate, if not prevent, what they knew was a public taking of private property without due process or just compensation.

262. In steps further and further from the truth, the changing of wording for the 1908 official document was inflated systematically to include a 70 foot fee simple ownership. Eventually DeAngelis represented the fraudulent information used to procure property not only to the Plaintiffs but to a member of Congress investigating the claims.

263. Because the parcel of land in question is 2.96 acres and the Montrose County requirement for a building/ septic permit is 3 acres, any amount of property claimed by Ozga or DeAngelis reduces the remaining portion to an uneconomic remnant. The taking is for the whole property.

# CONCLUSIONS

**264.** THIS SUIT IS FOR THE PUBLIC TAKING OF PRIVATE PROPERTY
WITHOUT CONDEMNATION.

**265.** This complaint is not a quiet title action. Barkman and Heal have a deed and a
survey. The employees of the Bureau of Reclamation and Montrose County have a theory.
Even under circumstances viewed most favorable to the Defendants, it still requires going to
court and letting a judge decide ownership.

**266.** With unknown motivation, all the Defendants consciously chose to place their
perceived authority in a position above the law of the land and the courts. The right to have
private property not taken by the government without due process or just compensation is as
fundamental to the American way of life as to be delineated in the federal Bill of Rights.

**267.** The Constitution does not say that citizens have these rights unless governmental
personnel find it too expensive or too inconvenient.

**268.** The Defendants made the conscious choice to disregard the sanctity of the
Constitution, federal and state laws, and the clearly established procedures for governmental
acquisition of private property.

**269.** The Defendants intentional actions to place themselves above the law have created
a legal conundrum that resulted in the Plaintiffs trying to follow the law and the Defendants
choosing a lawless course that suits their purpose.

**270.** The Defendants have engaged in an intentional course of action to deny the
Plaintiffs remedy or recourse.

43

**271.** Under the current state of affairs, the only people being denied access to the property are the owners.

**272.** Although not required, the Plaintiffs have exhausted all administrative remedy and have no other effective means except the judiciary to vindicate their rights. The only recourse for justice at this point is the court of law.

**273.** "No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All the officers of the government, from the highest to the lowest, are creatures of the law, and are bound to obey it." United States v. Lee, 106 U.S., at 220.

## Prayer for Relief

**274.** The Plaintiffs seek remedy in compensatory damages according to proof, punitive damages against the individuals, and injunctive and declaratory relief to restore the uncontested status quo and bar ongoing and systematic continuing violation of their constitutional rights, immunities and privileges, and such other and further relief as this court may deem just and proper.

---

## EXHIBITS

Exhibit 1 – Barkman and Heal property

Exhibit 2 – Coal Creek Valley, Jasmine to Kiowa

Exhibit 3 – closest distance between CQ and CQA Lateral

---

Date: 1/31/2011

Pro Se Plaintiff: Betty J. Barkman

Pro Se Plaintiff: Gerald E. Heal

1020 County Road 317

Crested Butte, Colorado 81224

970-349-7471

be1barkman@msn.com